CORRECTED OPINION
 

 LAWSON, J.
 

 The parents of a child with birth-related neurological injuries appeal an administrative order awarding them $100,000 jointly, in parental compensation, pursuant to section 766.31(l)(b)l., Florida Statutes (2007). That section provides for “an award of compensation ... to the parents or legal guardians ... which award shall not exceed $100,000.” They argue that this provision is ambiguous and should be construed to authorize an award of up to $100,000 to each parent rather than a single award of $100,000 to both parents. They also argue that such a construction would avoid three constitutional problems: equal protection, vagueness and access to courts. We disagree and find that the statute clearly limits parental compensation to a single award not to exceed $100,000. We also hold the statute constitutional. Accordingly, we affirm the joint award. In doing so, however, we note that our supreme court has construed an arguably similar statute in a manner consistent with Appellant’s equal protection argument in this case. Although we view this binding precedent as distinguishable, we also certify the question presented in this appeal as one of great public importance.
 

 Facts
 

 In August 2007, MacKenzie Samples was born with birth-related neurological injuries, as defined in section 766.302(2), Florida Statutes (2007). Her parents, Angela and Kenneth Samples (“the Samples”), filed a claim with the Division of Administrative Hearings (“DOAH”) for compensation under the Florida Birth-Related Neurological Injury Compensation Plan (“Plan”). The Florida Birth-Related Neurological Injury Compensation Association (“NICA”) agreed that MacKenzie’s injuries were compensable under the plan.
 

 Pursuant to a stipulation between the parties, NICA agreed to pay expenses for MacKenzie’s care pursuant to section 766.31(l)(a) and reasonable attorney’s fees and other expenses pursuant to section 766.31(l)(c). The stipulation resolved the Samples’ major claims except for the amount of parental compensation under section 766.31(l)(b)l. NICA agreed to make a lump sum payment of $100,000 to both parents jointly. However, the Samples reserved the right to have a hearing before an ALJ to raise the issue of the
 
 *21
 
 interpretation and constitutionality of section 766.31(l)(b)l.
 

 The ALJ approved the stipulation and afforded the parties a hearing to offer any proof they perceived pertinent to the interpretation of section 766.81(l)(b)l. The parties filed a Joint Pre-Hearing Stipulation which included the following “Admitted Facts”:
 

 (1) Once NICA ascertains that a claim is covered, NICA frequently offers a lump sum payment of a parental award totaling $100,000, regardless of whether there are one or two parents involved in the claim. Such offer is subject to the subsequent approval of the ALJ.
 

 (2) Pursuant to Section 766.309, Florida Statutes, the ALJ must make all NICA Awards, which includes the parental award pursuant to Section 766.31(l)(b)l., Florida Statutes. An ALJ has never ordered NICA to pay a parental award in excess of $100,000, regardless of whether there was one parent or two parents involved in the claim.
 

 (3) In a typical covered claim, NICA does not customarily argue that the parental award should be less than the full $100,000 authorized.
 

 (4) Once the ALJ has ordered payment of a parental award in the amount of $100,000, NICA pays the $100,000 parental award by check made payable to both parents jointly, unless otherwise ordered by the ALJ.
 

 (5) In the past, when there was a dispute between the parents with respect to the amount of the parental award to go to each parent, the ALJ has specified in the Final Order how much of the parental award would be paid to the mother and how much would be paid to the father. In those instances, the combined parental award was typically for the full $100,000.
 

 At the hearing, NICA introduced various documents comprising the legislative history of the Plan. The ALJ also took official notice of two final orders:
 
 Waddell v. Florida Birth-Related Neurological Injury Compensation Association,
 
 1999 WL 1483760, DOAH Case No. 98-2991N (May 11, 1999) and
 
 Wojtowicz v. Florida Birth-Related Neurological Injury Compensation Association,
 
 1994 WL 1027875, DOAH Case No. 93-4268N (July 22,1994). The ALJ entered a Final Order denying the Samples’ claim for an additional $100,000 as part of the parental award. He found that the legislative history of section 766.31(l)(b)l. showed that the Legislature clearly intended that the maximum award of $100,000 was for “both parents or legal guardians, and not for each parent or legal guardian.” The ALJ allowed the parties to make arguments and present evidence on the constitutional issues but did not rule on them.
 

 Ambiguity
 

 On appeal, the Samples first argue that section 766.31(l)(b)l. is ambiguous. The starting point of statutory interpretation is always the words themselves.
 
 GTC, Inc. v. Edgar,
 
 967 So.2d 781, 785 (Fla.2007). If statutory language is clear and unambiguous, “there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.”
 
 Id.
 
 (quoting
 
 A.R. Douglass, Inc. v. McRainey,
 
 102 Fla. 1141, 137 So. 157, 159 (1931)). However, if a statutory provision is ambiguous — subject to more than one reasonable interpretation — courts may employ rules of construction and extrinsic aids to discern legislative intent.
 
 Id.
 

 Section 766.31(1)(B)1. states:
 

 (1) Upon determining that an infant has sustained a birth-related neurological injury and that obstetrical services were delivered by a participating physician at
 
 *22
 
 the birth, the administrative law judge shall make an award providing compensation for the following items relative to such injury:
 

 [[Image here]]
 

 (b)l. Periodic payments of an award to the parents or legal guardians of the infant found to have sustained a birth-related neurological injury, which award shall not exceed $100,000. However, at the discretion of the administrative law judge, such award may be made in a lump sum.
 

 (Emphasis added). In three places, this provision plainly speaks of a single “award,” not to exceed $100,000, to a plural “parents or legal guardians.”
 

 The Samples concede that the term “award” is singular and the term “parents” is plural. Nevertheless, they argue that the statute is ambiguous because it does not clearly explain how a singular award to two parents replaces the common-law right of each parent to recover individual damages for filial consortium. This argument is flawed for at least two reasons. First, the statute plainly authorizes no-fault “compensation,” not fault-based “damages.” The fact that it does not explain how such compensation replaces common-law damages does not make it ambiguous. Second, the Samples’ argument relies on a rule of statutory construction that statutes enacted in derogation of common law should be strictly construed in favor of the common law, and they must be clear on the extent of such abrogation or change; when they are not clear on the extent of abrogation or change, the common law rule stands.
 
 Slawson v. Fast Food Enter.,
 
 671 So.2d 255, 257-58 (Fla. 4th DCA 1996) (citing
 
 Carlile v. Game & Fresh Water Fish Comm’n,
 
 354 So.2d 362 (Fla.1977)). Appellants’ reliance on a rule of statutory construction as a basis for finding an ambiguity places the proverbial “cart before the horse” — because rules of statutory construction are designed to be applied only after a statute is found to be ambiguous, to resolve the ambiguity. Here, the plain language of section 766.31(l)(b)l. clearly and unambiguously provides “an award to the parents ... which award shall not exceed $100,000.” This language cannot be reasonably interpreted to provide multiple awards of $100,000 to each parent of a qualifying child.
 

 Even if it were necessary to resort to rules of construction, we would reject the Samples’ contention that the Plan does not clearly define the extent to which parental filial consortium claims have been abrogated. Section 766.303(2), Florida Statutes, expressly excludes filial consortium claims, stating that the rights and remedies granted by the Plan “shall exclude all other rights and remedies of such infant, her or his personal representative, parents, dependents, and next of kin, at common law or otherwise ... arising out of or related to a medical negligence claim with respect to such injury.”
 
 [1]
 

 Without conceding that the statute is ambiguous or that this court need resort to statutory construction,
 
 [2]
 
 NICA notes that
 
 *23
 
 the legislative history clearly establishes that the Legislature intended a single award to parents. When section 766.31(l)(b) was enacted, it used the singular terms “parent or legal guardian.” Ch. 88-1, Laws of Fla.; § 766.31(l)(b), Fla. Stat. (1988). In 1989, the Legislature changed these terms to “parents or legal guardians.” Ch. 89-186, § 5, Laws of Fla.; § 766.31(l)(b)l., Fla. Stat. (1989). This change was made “to clarify the fact that the maximum award of $100,000 is for both parents or legal guardians and is not intended to award up to $100,000 for each parent or legal guardian.” Fla. H.R. Ins. Comm., CS for CS for HB 339, Final Staff Analysis (June 30 1989) (on file with Fla. State Archives). Clearly, the Legislature intended the statute to provide a single award of up to $100,000 for both parents.
 

 Constitutional Challenges
 

 The Samples challenge section 766.31(1)(b) 1. on three constitutional grounds: equal protection, vagueness and access to courts. The parties agree that the ALJ correctly refrained from deciding these challenges.
 
 Key Haven Associated Enter., Inc. v. Bd. of Trustees of Internal Improvement Trust Fund,
 
 427 So.2d 153 (Fla.1982). In
 
 Key Haven,
 
 our supreme court held that facial constitutionality may not be decided in an administrative proceeding, but may be decided by a district court of appeal on direct review of agency action.
 
 Id.
 
 at 157. The district court may also decide “as applied” constitutional challenges on direct review of agency action, but only after the challenger has exhausted all administrative remedies to allow the agency a full opportunity to reach a “sensitive, mature and considered decision upon a complete record appropriate to the issue.”
 
 Id.
 
 at 158. Accordingly, we review the Samples’ constitutional challenges de novo and note that they are issues of first impression.
 

 1. Equal Protection
 

 The Equal Protection Clause of the United States Constitution provides that “[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const. Amend. XIV, § 1. Similarly, the Equal Protection Clause of the Florida Constitution provides that “[a]ll natural persons are equal before the law-” Art. I, § 2, Fla. Const. The parties agree that no suspect class, such as race, is involved, and therefore, the rational relationship test applies to the Samples’ equal protection claim.
 
 Miller v. State,
 
 971 So.2d 951, 952 (Fla. 5th DCA 2007). Under this test, a statute must be upheld if the classification bears a rational relationship to a legitimate government objective.
 
 Id.
 
 Conversely, a statutory classification violates equal protection if it treats similarly situated people in a different manner' based upon an illogical and arbitrary basis.
 
 Id.
 

 As the party challenging section 766.31(l)(b)l., as applied, on equal protection grounds, the Samples bear the burden to show that (1) they were treated differently under the law from similarly situated persons, (2) that the statute intentionally discriminates against them, and (3) that there was no rational basis for the discrimination.
 
 Id.
 
 This burden is a heavy one, with any doubts being resolved in favor of the statute’s constitutionality.
 
 McElrath v. Burley,
 
 707 So.2d 836, 839 (Fla. 1st DCA 1998). The statute must be upheld if there is any conceivable state of facts or plausible reason to justify it, regardless of whether the Legislature actually relied on such facts or reason.
 
 Id.
 

 
 *24
 
 The Samples claim that by awarding them $100,000 in this case, and awarding single parents $100,000 in other cases, similarly situated people are treated differently without any rational explanation. They argue that a child may have only one parent because the other parent has died or has abandoned the child. Or, if the child has two parents, they may be married, unmarried or divorced; they may share childcare or not. Although the Samples do not explain how such scenarios result in disparate treatment, they appear to suggest that disparate treatment would result if two parents receive a total of $100,000 in one case while a single parent receives a total
 
 of
 
 $100,000 in another case.
 

 However, we agree with NICA that similarly situated people within the classification of “parents” are not treated differently. Every child subject to NICA has two biological parents, a mother and a father. § 766.302(9), Fla. Stat. If a single parent is awarded $100,000, the absent parent or dead parent’s estate is awarded nothing. If two parents, whether together or apart, apply for an award, they cannot receive more than $100,000 total. If the two parents dispute the distribution of the award amongst each other, the ALJ decides how much each shall receive, up to a total of $100,000.
 

 The Samples also argue that if only one award of $100,000 is available, then two-parent families are shortchanged by half when compared with one-parent families. They rely upon
 
 St. Mary’s Hospital, Inc. v. Phillipe,
 
 769 So.2d 961 (Fla.2000) as a case in which the Florida Supreme Court held that an analogous statutory classification was ambiguous and construed it broadly to avoid violating equal protection. In
 
 St. Mary’s Hospital,
 
 a mother died during childbirth and her child was born with brain damage. Her husband filed a wrongful death action against the hospital on behalf of himself and their four surviving children.
 
 Id.
 
 at 963. The hospital conceded liability and the parties voluntarily arbitrated the issue of damages. Arbitrators awarded the husband and the injured child $250,000 each in noneconomic damages. They awarded the three remaining children $175,000 each in noneco-nomic damages. The hospital appealed, arguing that the multiple noneconomic damage awards exceeded the cap of $250,000 per incident in violation of section 766.207(7)(b), Florida Statutes.
 
 Id.
 
 at 963. The district court agreed with the hospital and reversed the award, but certified a question of great public importance as to whether the $250,000 statutory cap on non-economic damages applied to each beneficiary under the Wrongful Death Act, or in the aggregate to all beneficiaries.
 
 Id.
 
 at 962-63.
 

 The supreme court found that the statutory cap was ambiguous because it first stated it was “$250,000 per incident,” but later described how such damages were to be calculated be referring to a singular “claimant.”
 
 Id.
 
 at 968. Finding ambiguity, the Court construed the cap to allow for awards of up to $250,000 for each claimant rather than an
 
 aggregate
 
 of $250,000 per incident. The Court reached its conclusion in part to avoid an equal protection problem, reasoning that if the cap were construed to limit non-economic damages to $250,000 per incident without regard to the number of claimants:
 

 then the death of a wife who leaves only a surviving spouse to claim the $250,000 is not equal to the death of a wife who leaves a surviving spouse and four minor children, resulting in five claimants to divide $250,000. We fail to see how this classification bears any rational relationship to the Legislature’s stated goal of alleviating the financial crisis in the medical liability industry. Such a cate
 
 *25
 
 gorization offends the fundamental notion of equal justice under the law and can only be described as purely arbitrary and unrelated to any state interest.
 

 Id.
 
 at 972 (citation omitted).
 

 We do not believe that the supreme court’s equal protection analysis in
 
 St. Mary’s Hospital
 
 applies to section 766.31(l)(b)l. As NICA correctly notes, the statute at issue in
 
 St. Mary’s Hospital
 
 dealt with fault-based damages, not a no-fault compensation scheme as provided for in section 766.31(l)(b)l.
 
 See
 
 § 766.301(2), Fla. Stat. (“It is the intent of the Legislature to provide compensation, on a no-fault basis, for a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation.”). It seems apparent from the language of the statute that the parental award in section 766.31(l)(b)l. is primarily intended to compensate parents for the added burdens and costs of providing care for a child with permanent and severe neurological injuries, not as damages to make parents whole for the loss of consortium negligently caused, as in a traditional tort action.
 
 [3]
 

 Furthermore, the classification of “parents” in section 766.31(l)(b)l. is narrower than the potentially affected class of wrongful death survivors affected by the statutory cap in
 
 St. Mary’s Hospital.
 
 The parties seem to accept that the parental award will be made jointly to, or split between, at most, only two people. In contrast, medical malpractice and wrongful death claimants subject to the cap include “any person having a cause of action for damages based on personal injury or wrongful death arising from medical negligence.” § 766.202(1), Fla. Stat. As seen in
 
 St. Mary’s Hospital,
 
 the number of claimants in any given wrongful death case can vary, depending on how many children or other claimants exist. Thus, the legislative classification in this case is well-defined and narrowly drawn when compared to the classification in
 
 St. Mary’s Hospital.
 

 Based upon these two distinctions, we find that section 766.31(l)(b)l. does not result in the disparate treatment of similarly situated people within the class of “parents.”
 

 The second element is whether the statute intentionally discriminates against the Samples. The Samples fail to address this element.
 

 The third element is whether there is a rational basis, or a rational relationship to a legitimate government objective, for the discrimination. Assuming discrimination exists, the Samples argue that the parental cap bears no rational relationship to the Plan’s stated goals of reducing medical malpractice insurance premiums by providing no-fault compensation for a limited class of high-cost catastrophic injuries. §§ 766.301(l)(c) and (2), Fla. Stat. (2007). NICA argues that the Samples have failed to meet the burden of overcoming the presumption in favor of the validity of such statutory classifications,
 
 State v. Leicht,
 
 402 So.2d 1153 (Fla.1981), and of showing that there is “no conceivable factual predicate rationally able to support the classification being attacked.”
 
 Loxahatchee Riv
 
 
 *26
 

 er Envtl. Control Dist v. School Bd. of Palm Beach County,
 
 496 So.2d 930, 938 (Fla. 4th DCA 1986). “It is not the court’s function to determine whether the legislation achieves its intended goal in the best manner possible, but only whether the goal is legitimate and the means to achieve it are rationally related to the goal.”
 
 Id.
 

 NICA also argues that the Samples have failed to refute their argument below that its interpretation of the parental award is rationally related to the goal of maintaining the actuarial soundness of the Plan. Although the Samples claim NICA failed to present evidence to support this argument, NICA correctly notes that the Samples bear the burden of proof, not NICA.
 
 See, e.g., Sasso v. Ram Prop. Mgmt.,
 
 431 So.2d 204, 217 (Fla. 1st DCA 1983) (holding that government objective must be specifically identified, but may be done by “(1) reliance on statements of intent from legislative reports and journals; (2) inferences of an objective by reference to similar legislation or actions taken by the legislative body, or (3) gleaning the purpose from the legal arguments of the government before the court.”). Thus, the rational basis for a classification need not be apparent from the statute or supported by evidence or empirical data. Instead, it may be based solely upon the government’s “rational speculation.”
 
 Tiedemann v. Dep’t of Mgmt. Servs.,
 
 862 So.2d 845, 846-47 (Fla. 4th DCA 2003).
 

 Despite this low standard, NICA notes that the Plan expressly evidences a need to limit awards, including the parental award, to ensure actuarial soundness so that children may be compensated and new claims may be accepted. The Legislature expressly stated that it intended to provide a
 
 “limited
 
 system of compensation ....” § 766.301(d), Fla. Stat. (2007) (emphasis added). The Plan also contains specific provisions relating to actuarial soundness. For example, on the assessment side of the equation, sections 766.314(5)(b) and (c) provide that if existing assessments are insufficient to maintain the NICA fund on an “actuarially sound” basis, additional appropriations are authorized. On the compensation side, section 766.314(9)(c) provides that if funds on hand are insufficient to cover anticipated expenses, NICA “shall not accept any new claims without express authority from the Legislature.” If a claim is not accepted because of the above provision, the Plan ceases to be the exclusive remedy. § 766.314(9)(d), Fla. Stat. (2007). Thus, maintaining actuarial soundness is an express goal of the program and is important to achieving the other goals of the program.
 

 Limiting parental compensation to $100,000, as required under section 766.301(l)(b)l., instead of judicially authorizing up to $200,000, is rationally related to actuarial soundness — the less money NICA is required to pay, the easier it will be for the Plan to remain actuarially sound. Similarly, in
 
 Loxahatchee,
 
 the appellate court found that a statute exempting public schools from paying impact fees imposed by other public entities was rationally related to the legitimate government goal of keeping school construction costs within reasonable bounds, thereby lessening the burden to taxpayers. 496 So.2d at 938.
 

 In reply, the Samples argue that if actuarial soundness is held to be a legitimate governmental objective, any legislative classification that saves the Plan money would pass equal protection muster, no matter how arbitrary or discriminatory. As an example, they assert that limiting parental awards for all brown-eyed parents to $5 would enhance actuarial soundness. However, that example arbitrarily treats persons within the same classifica
 
 *27
 
 tion of parents differently. The classification in the instant case simply creates the class of parents, who are collectively eligible for parental compensation of up to $100,000. Historically, NICA has always paid the maximum award, but has never paid more than the maximum award based on the claims of individual parents. Thus, unlike the Samples’ example, the classification does not result in disparate treatment within the classification of parents.
 

 Even if the statute results in disparate treatment within the classification of parents, NICA argues that a “statute [which] results in some inequality will not invalidate it; the statute must be so disparate in its effect as to be wholly arbitrary.”
 
 Lox-ahatchee,
 
 496 So.2d at 938. NICA argues that the main focus of the Plan is paying for the child’s medical expenses. As a secondary focus, the Legislature authorized an additional $100,000 in parental compensation. Any resulting discrimination is minimal, unintentional and not arbitrary.
 

 2. Vagueness
 

 A statute is unconstitutionally vague if it “fails to provide a person of ordinary intelligence with a reasonable opportunity to know what is prohibited, and is written in a manner that encourages or permits arbitrary or discriminatory enforcement.”
 
 Cashatt v. State,
 
 873 So.2d 430, 435 (Fla. 1st DCA 2004). The Samples argue that section 766.31(1)(b)1. is unconstitutionally vague because if fails to give ALJs any guidance in determining how much compensation to award or how to divide an award between two parents who do not wish to share equally or share at all. Without such legislative guidance, the Samples argue that such awards are left entirely to an ALJ’s unfettered discretion.
 

 NICA argues that the Samples appear to be asserting a facial vagueness challenge. “[A] facial challenge for vagueness will be upheld only if the enactment is impermissibly vague in all of its applications.”
 
 Brown v. State,
 
 629 So.2d 841, 843 (Fla.1994);
 
 Cashatt,
 
 873 So.2d at 434. Section 766.31(1)(b)1. requires the ALJ to make an award of compensation to the parents or legal guardians not to exceed $100,000. NICA argues that the statute does not require an ALJ to award less than $100,000, nor does it require an ALJ to apportion an award between parents. Thus, an ALJ may award the full $100,000 to both parents jointly, as the stipulated facts demonstrate is typically the case. Thus, NICA claims the Samples have failed to demonstrate that the statute is impermissibly vague in all of its applications.
 

 The Samples point to two prior DOAH final orders in which the ALJ was faced with the issue of determining how to divide a parental award between two parents:
 
 Waddell v. Florida Birth-Related Neurological Injury Compensation Association,
 
 1999 WL 1483760, DOAH Case No. 98-2991N (May 11, 1999) and
 
 Wojtowicz v. Florida Birth-Related Neurological Injury Compensation Association,
 
 1994 WL 1027875, DOAH Case No. 93-4268N (July 22, 1994). In both cases, the ALJ sought guidance from the common-law filial consortium elements in dividing the parental award because the statute did not specify any other factors upon which such a determination should be made.
 

 The Samples argue that NICA’s position that the parental award is not a substitute for common-law damages effectively results in even less guidance for ALJs in making parental awards. In effect, the Samples argue that if the ALJ cannot rely on the common-law factors, what factors should the ALJ rely on and
 
 *28
 
 what is to prevent an ALJ from making an arbitrary and discriminatory award? Admittedly, the statute offers no guidance to an ALJ on how much to award parents, how to divide an award between parents or whether to authorize the award in lump sum or periodic payments. However, the above-cited final orders actually support our conclusions that: (a) section 766.31(l)(b)l. awards are intended primarily as economic compensation to parents rather than non-economic damages; (b) such awards are subject to reasonable and articulable factors rather than the unfettered discretion and arbitrary whims of an ALJ; and (c) such decisions are subject to judicial review for abuse of discretion. Although both decisions alluded to common-law loss of consortium factors, the determinative factor for dividing the award between parents in each case appears to have been economic compensation for the primary caretaker of the child. For example, in
 
 Wojtowicz,
 
 the ALJ awarded the mother $95,000 and the father $5,000 because the mother was the child’s primary caretaker and had the greatest loss of economic opportunity because of her care-taking role. Likewise, in
 
 Waddell,
 
 the ALJ ordered periodic payments to the mother, as the custodial parent, “absent a change in the custodial arrangement.”
 
 [4]
 
 In addition, both final orders contained extensive factual findings and well-articulated reasoning. And, both were subject to judicial review pursuant to section 766.311. Florida Statutes.
 

 Accordingly, we conclude that section 766.31(l)(b)l., when read
 
 in pari materia
 
 with other NICA provisions, is sufficiently clear in its intent to provide no-fault economic compensation to parents. In most cases, the maximum amount is awarded to the parents jointly. In those rare cases in which the award is split between the mother and father, it can be done so based on articulable economic reasons supported by detailed factual findings. Section 766.304, Florida Statutes, affords the ALJ all powers authorized under the APA, including conducting an evidentiary hearing to determine the proper amount, division and distribution of the parental award. Section 766.311 provides the right of judicial review.
 
 [5]
 

 3. Access to Courts
 

 The Samples also claim that section 766.31(l)(b)l. violates their constitutional right of access to courts by extinguishing their common-law loss of consortium claims without meeting the exceptions in
 
 Kluger v. White,
 
 281 So.2d 1, 4 (Fla.1973). In
 
 Kluger,
 
 the Florida Supreme Court held:
 

 [T]he Legislature is without power to abolish [the right of access to courts] without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.
 

 Stated in the
 
 affirmative, to
 
 abolish a common-law claim, the Legislature must provide: (a) a reasonable alternative remedy
 
 *29
 
 or commensurate benefit; or (b) an overpowering public necessity and no alternative method of meeting such public necessity.
 
 Smith v. Dep’t of Ins.,
 
 507 So.2d 1080 (Fla.1987).
 
 [6]
 

 In discussing the first permissible means of abolishing a common-law claim, the Samples limit their argument on this exception to “commensurate benefit,” and ignore the “reasonable alternative remedy” portion of the standard. Because these two portions of the standard are stated in the alternative, the Samples appear by their silence to have conceded that the statute provides a reasonable alternative remedy and therefore does not unconstitutionally restrict their access to courts.
 

 Even if the Samples’ failure to address this point is not viewed as a concession, we find that the Plan provides a reasonable alternative remedy. NICA notes that like affected children, affected parents receive a streamlined recovery in an administrative setting without the need to prove fault and other damages. Other notable statutory no-fault concepts such as PIP and worker’s compensation have long been held to provide reasonable alternative remedies to traditional tort remedies because they provided prompt and certain recovery for certain economic losses.
 
 See Lasky v. State Farm Ins. Co.,
 
 296 So.2d 9, 15 (Fla.1974) (finding that PIP statute provided reasonable alternative remedy to traditional tort remedies);
 
 Martinez v. Scanlan,
 
 582 So.2d 1167, 1171 (Fla.1991) (finding amendments which reduced worker’s compensation benefits still constituted a reasonable alternative to traditional tort remedies). Several courts have noted the same aspects in the NICA Plan.
 
 See, e.g., Humana of Fla., Inc. v. McKaughan,
 
 652 So.2d 852 (Fla. 2d DCA 1995) (comparing no-fault remedies in worker’s compensation and NICA as substitutes for traditional tort remedies),
 
 superseded by statute on other grounds
 
 as
 
 noted, in Florida Birth-Related Neurological Injury Comp. Ass’n v. Fla. Div. of Admin. Hrgs.,
 
 948 So.2d 705, 713 (Fla.2007);
 
 Fluet v. Fla. Birth-Related Neurological Injury Compensation Ass’n,
 
 788 So.2d 1010, 1011 (Fla. 2d DCA 2001) (“Although the benefit paid under the Plan is more restricted than the remedies provided by tort law, the plan does not require the claimant to prove malpractice and provides a streamlined administrative hearing to resolve the claim.”).
 

 Not surprisingly, the First District Court of Appeal recently held that the Plan’s no-fault compensation system provides a reasonable alternative remedy to civil recourse that might otherwise have been available.
 
 Macri v. Clements and Ashmore, P.A.,
 
 15 So.3d 762, 765-66 (Fla. 1st DCA 2009). In
 
 Macri,
 
 the appellants, who settled their suit against the hospital involved, argued that their right to sue the doctors and other parties would be denied by the Plan’s exclusivity provisions. The court rejected that argument, stating that the no-fault compensation in the Plan was similar to other no-fault compensation schemes that have withstood such challenges, and that, “even if recovery is not actually obtained under the Plan the no-fault system of compensation therein is a reasonable alternative to the civil recourse
 
 *30
 
 which might have otherwise been available.”
 
 Id.
 
 at 766.
 

 As for the “commensurate benefit” prong of the first
 
 Kluger
 
 exception, the Samples concede that the Plan “may well be a valuable and commensurate benefit to a person injured at birth.” However, they claim it is “doubtful” whether the Plan provides a parental benefit commensurate to a common law filial consortium claim. They claim that a speedy recovery is not a commensurate benefit because “there is no need for speedy recovery
 
 of
 
 intangible damages” of parents like there is for the economic needs of the injured child. This argument is speculative and ignores the fact that the parental award is not a substitute for noneconomic damages, but instead serves as economic compensation. NICA argues that the Plan provides commensurate benefits by guaranteeing timely compensation to injured children and parents and alleviating uncertainty for malpractice insurers in providing needed malpractice insurance to obstetricians. In addition to prompt and guaranteed compensation, the Plan saves parents the cost of attorney’s fees by making such awards additional to parental compensation.
 
 See Univ. of Miami v. Echarte,
 
 618 So.2d 189, 194 (Fla.1993) (finding that medical malpractice arbitration statutes provided commensurate benefits in part by providing for prompt payment and saving of attorney’s fees). Accordingly, we conclude the Plan provides both a reasonable alternative remedy and a commensurate benefit.
 

 Regarding the second Kluger exception, the Samples in effect concede that the Legislature expressly demonstrated an overwhelming public necessity for the plan in section 766.301(l)(c), Florida Statutes (2007). That section, in whole, states:
 

 (1) The Legislature makes the following findings:
 

 (a) Physicians practicing obstetrics are high-risk medical specialists for whom malpractice insurance premiums are very costly, and recent increases in such premiums have been greater for such physicians than for other physicians.
 

 (b) Any birth other than a normal birth frequently leads to a claim against the attending physician; consequently, such physicians are among the physicians most severely affected by current medical malpractice problems.
 

 (c) Because obstetric services are essential, it is incumbent upon the Legislature to provide a plan designed to result in the stabilization and reduction of malpractice insurance premiums for providers of such services in Florida.
 

 (d) The costs of birth-related neurological injury claims are particularly high and warrant the establishment of a limited system of compensation irrespective of fault. The issue of whether such claims are covered by this act must be determined exclusively in an administrative proceeding.
 

 (2) It is the intent of the Legislature to provide compensation, on a no-fault basis, for a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation. This plan shall apply only to birth-related neurological injuries.
 

 “The Legislature has the final word on declarations on public policy, and the courts are bound to give great weight to legislative determinations of facts.”
 
 Ec-harte,
 
 618 So.2d at 196. Such legislative determinations of public purpose and facts are presumed correct and entitled to deference, unless clearly erroneous.
 
 Id.
 
 In
 
 Echarte,
 
 the Florida Supreme Court held that the Florida Legislature had demonstrated an overwhelming public necessity
 
 *31
 
 in enacting comprehensive legislation (which included the NICA Plan) to combat the medical malpractice crisis.
 
 Id.
 

 Instead, the Samples focus solely on the “no alternative method” part of the exception, arguing that NICA cannot demonstrate that limiting parental compensation to $100,000 in the aggregate, rather than per parent, is necessary or furthers the legislative goal stabilizing malpractice insurance premiums and providing essential obstetric services.
 

 In discussing this element, the court in
 
 Echarte
 
 stated, “in determining whether no alternative means exists to meet the public necessity of ending the medical malpractice crisis, the plan as a whole, rather than focusing on one specific part of the plan, must be considered.”
 
 Id.
 
 at 197. Thus, the Samples mistakenly focus on section 766.31(l)(b)l. rather than the NICA Plan as a whole. The Court concluded that the Legislature’s adoption of the comprehensive civil justice reforms (including the NICA Plan), combined with strengthened regulation of the medical profession, as recommended by an exhaustive report of the Academic Task Force for Review of the Insurance and Tort Systems, demonstrated that no alternative means existed to meet the public necessity.
 
 Id.
 
 at 197. The same reasoning applies in the instant case. Accordingly, we conclude that the statute also satisfies the second
 
 Kluger
 
 exception.
 

 Conclusion
 

 Section 766.31(l)(b)l. is neither ambiguous, nor violative of constitutional proscriptions related to equal protection, vagueness or access to courts. Although we have concluded that the statute discussed in
 
 St. Mary’s Hospital
 
 is sufficiently different from the statute at issue in this case to make the
 
 St. Mary’s Hospital
 
 precedent distinguishable, we acknowledge that the statutes are analogous enough that our supreme court may view the issue differently. We also believe that the issue is one of great public importance, and as such certify the following question to the Florida Supreme Court:
 

 Does the limitation in section 766.31(l)(b)l., Florida Statutes, of a single award of $100,000 to both parents violate the Equal Protection Clause of the United States and Florida Constitutions?
 

 AFFIRMED; QUESTION CERTIFIED.
 

 TORPY and EVANDER, JJ., concur.
 

 [1]
 

 . Even if the Plan did not expressly exclude parental claims, they would be necessarily excluded because filial consortium claims are derivative claims dependent upon a parent's relationship to the injured child.
 
 Bashaway v. Cheney Bros., Inc.,
 
 987 So.2d 93, 95 (Fla. 1st DCA 2008). Because the Plan clearly extinguishes common-law negligence claims by children for birth-related neurological injuries, it necessarily extinguishes their parents' filial consortium claims.
 

 [2]
 

 .
 
 See Rollins v. Pizzarelli,
 
 761 So.2d 294, 299 (Fla.2000) (“We recognize that when the statutory language is clear, legislative history cannot be used to alter the plain meaning of the statute, [citation omitted]. However,
 
 *23
 
 when the statutory language is susceptible to more than one meaning, legislative history may be helpful in ascertaining legislative intent. [citation omitted].”).
 

 [3]
 

 . If the parental award is intended as compensation for nonprofessional custodial care of the child, the Samples’ suggested solution would logically give rise to the same type of equal protection argument that they make. In other words, if the award is intended as compensation for the child's non-professional custodial care, why should $100,000 be provided to aid in the care of a child with one parent when $200,000 is provided to aid in the care of a child with two parents. The burdens of non-professional custodial care for a single child in this condition would not be greater in a household with two parents available to share in the care.
 

 [4]
 

 . The ALJ ordered periodic payments instead of a lump sum payment due to the parents’ lack of maturity.
 

 [5]
 

 . Further, NICA correctly notes that if the Samples' argument is interpreted as an “as applied” rather than facial vagueness challenge, they are limited to the particular circumstances of this case.
 
 Beckett v. Dep’t of Fin. Servs.,
 
 982 So.2d 94 (Fla. 1st DCA 2008). In this case, the AU awarded the Samples the maximum compensation in a lump sum payment pursuant to a stipulation. Thus, they cannot claim that the ALJ arbitrarily applied the statute.
 

 [6]
 

 . Before addressing these exceptions, NICA claims that the Samples’ right of access to courts is not denied at all by the Plan because section 766.303(2) allows a civil action in lieu of the Plan where there is "clear and convincing evidence of bad faith or malicious purpose or willful and wanton disregard of human rights, safety, or property.” This argument ignores the fact that that same exclusivity provision extinguishes the much broader common-law right to sue under a general negligence theory, along with parental derivative claims.